UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BENEFIT COSMETICS LLC,

       Plaintiff,

    v.

E.L.F. COSMETICS, INC.,

       Defendant.

Case No. 23-cv-00861-RS

**OPINION AND ORDER**

## I. INTRODUCTION

Benefit Cosmetics LLC ("Benefit") claims e.l.f. Cosmetics, Inc. ("e.l.f.") has infringed on the trademark and trade dress of Benefit's popular mascara, Roller Lash. This case came on for trial without a jury on August 26, 2024, and concluded on September 3, 2024. The parties then submitted revised proposed findings of fact and conclusions of law before returning to present closing arguments on October 30, 2024.

As Benefit tells it, e.l.f. intentionally capitalized on the goodwill of Roller Lash and guaranteed its own commercial success by copying Roller Lash's name, packaging, and marketing wholesale. E.l.f. [1] admits Roller Lash served as inspiration for e.l.f.'s own mascara, Lash 'N Roll. However, e.l.f. argues, any similarities in Lash 'N Roll's name or trade dress are mere "cues" to consumers that Lash 'N Roll is an affordable alternative to Roller Lash.

---

[1] Although e.l.f.'s name is consistently styled in lowercase in the filings, this Opinion and Order will capitalize e.l.f. at the start of sentences to align with standard grammatical conventions.

United States District Court
Northern District of California

United States District Court
Northern District of California

Trademark and trade dress law is designed "to protect the goodwill created by using a uniform mark and to protect the ability of consumers to distinguish among competing producers." *Blockbuster Videos, Inc. v. City of Tempe*, 141 F.3d 1295, 1299 (9th Cir. 1998). Therefore, the likelihood of consumer confusion as to the source of a product is the "touchstone" of infringement claims. *E.g., Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 431 (9th Cir. 2017); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992). E.l.f. avers the success of products like Lash 'N Roll – often referred to as duplicates or "dupes" of their more expensive counterparts – relies on consumers distinguishing between the expensive inspiration and the product at hand. Therefore, e.l.f. argues, Lash 'N Roll does not cause the consumer confusion necessary to infringe on Benefit's trademark or trade dress.

While Benefit succeeds in establishing the protectability of its trademark and trade dress, it ultimately fails to show a likelihood of consumer confusion around the source of e.l.f.'s Lash 'N Roll. Benefit needed to show consumer confusion is "probable, not simply a possibility." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002) (quoting *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987)). Based on the sufficiency, weight, and credibility of the testimony of the witnesses, the documentary evidence admitted at trial, and the post-trial submissions of the parties, consumer confusion is too speculative to meet this burden. Therefore, e.l.f. has not infringed on Benefit's trademark nor on its trade dress. This Opinion and Order comprises the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).

## II. BACKGROUND

### A. Parties

Benefit is a cosmetics company founded in 1967 and headquartered in San Francisco, California. Benefit designs, manufactures, and sells mascaras and a variety of other cosmetic products, which are sold throughout the United States and abroad in over fifty-five countries. Benefit is a what is known as a "prestige" beauty company. Prestige companies sell products at a higher price than their counterparts, which are often referred to as "mass" cosmetics products.

Prestige products are characteristically sold in department stores (e.g., Macy's, Bloomingdales, Nordstrom, Neiman Marcus, Belk, and Henri Bendel), beauty specialty stores (e.g., Sephora and Ulta Beauty), or on those stores' websites. Benefit's products are known for their catchy, feminine, and sometimes retro branding.

E.l.f. is a cosmetics company founded in 2004 and headquartered in Oakland, California. E.l.f. offers a range of beauty, skin, and cosmetic products in the United States. E.l.f. is a mass beauty company, selling cosmetics and other products at lower price points than their prestige counterparts. The sales channels of prestige and mass companies also differ. Mass beauty products like e.l.f. are sold in drug stores, grocery stores, and big-box stores — all retailers that sell many products other than cosmetics. E.l.f.'s products are vegan and cruelty-free, features it regularly highlights in its marketing and branding.

Both companies advertise on social media, particularly targeting younger beauty consumers, also known as Generation Z ("Gen Z"). Benefit and e.l.f. pay directly for marketing placements in more traditional advertisements, but also pay and incentivize influencers on social media platforms to promote their products. Much like other beauty brands, both parties rely on and encourage unpaid, user-generated endorsements and reviews of their products on platforms like Instagram, TikTok, and YouTube.

### B. Benefit's Product

In 2015, Benefit released a curling mascara branded "Roller Lash." Whereas some mascaras are designed to length and thicken the eyelashes, a curling mascara is one designed to curl the eyelashes. In developing Roller Lash, Benefit also designed a specialized mascara brush with a pink and curved brush head with short bristles, which Benefit branded as "Hook 'N' Roll." The primary packaging of mascara usually consists of 1) a base tube in which the mascara product itself is stored and 2) an applicator wand, which users hold by the cap and is screwed into the base tube when not in use. Roller Lash's primary packaging went through several iterations with Benefit's contracted industrial designer before Benefit eventually selected the current design. Roller Lash's primary packaging has a black base, pink cap, vertical script in the same shade of

1    pink going up the base, a ribbed collar on top of the base, and a diamond texture on the cap.

2        Benefit owns U.S. Trademark Registration No. 4752213 for the mark ROLLER LASH in

3    International Class 3 for use in connection with "mascara; cosmetics." Benefit also owns U.S.

4    Trademark Registration No. 4796514 for the mark HOOK 'N' ROLL in International Class 3 for

5    use in connection with "a makeup applicator sold as a component of cosmetics."

6        Total U.S. revenue for Roller Lash mascara from its launch in 2015 through August 2023

7    was approximately $278 million. Benefit markets its Roller Lash mascara through online

8    advertising via Google Ads, internet banner ads, social media advertising on YouTube, Instagram,

9    and TikTok, in-store displays and window displays, billboards, wall signs, and in-person events.

10    Benefit also engages influencers on various social media, namely TikTok, Instagram, and

11    YouTube, to promote Roller Lash. Benefit currently sells both a full size and mini version of

12    Roller Lash, which are priced at $29 and $16, respectively.

13        **C.  E.l.f.'s Product**

14        In December 2022, e.l.f. released a new mascara under the name "Lash 'N Roll." The Lash

15    'N Roll mascara is also a mascara designed to curl the eyelashes. Certain members of e.l.f.'s

16    development and design team were aware of Benefit and its Roller Lash mascara prior to

17    developing and designing e.l.f.'s Lash 'N Roll mascara. These team members also knew Benefit's

18    Roller Lash was the best-selling prestige curling mascara in the United States. E.l.f. admits it

19    sought to "cue" to Benefit's Roller Lash with its curling mascara product. Separately, in selecting

20    a name for the mascara, e.l.f. wanted to play off some of its other mascara lines, whose names

21    reference music – Lash It Loud and Lash Beats. Lash 'N Roll's primary packaging was originally

22    a pink base with a matching pink cap. However, due to production difficulties with matching the

23    cap color to the base, e.l.f. changed its design to a black bottom and pink cap. This color

24    combination, with writing in pink going vertically up the base, remains the current design of the

25    primary packaging. Lash 'N Roll's primary packaging does not have any texture, collar, or

26    tapering.

27        In April 2022, e.l.f. applied to register federally the LASH 'N ROLL mark with the United

United States District Court
Northern District of California

States Patent and Trademark Office ("USPTO"). This application was subsequently published for opposition in the USPTO, at which point Benefit filed an opposition. On July 31, 2023, the USPTO Board suspended the opposition pending the outcome of this action.

Like Benefit, e.l.f. markets Lash 'N Roll through online advertising via Google Ads, internet banner ads, social media advertising on YouTube, Facebook, TikTok, in-store displays, and window displays. E.l.f. also engages influencers on TikTok, Instagram, and YouTube to promote Lash 'N Roll. E.l.f. sells Lash 'N Roll only in its "full" size for $6.

### D. Procedural Background

In January 2023, Benefit became aware e.l.f. was selling mascara under the Lash 'N Roll mark and using the averred infringing trade dress. It thereafter notified e.l.f. of its registered trademark and common law trade dress rights and requested e.l.f. cease and desist from its acts of infringement. After e.l.f. continued selling its Lash 'N Roll mascara without modifying the name or packaging, Benefit filed suit in February 2023. In July 2023, e.l.f.'s partial motion to dismiss was denied and discovery commenced. The parties agreed to a bench trial, which began on August 26, 2024, and spanned six days. On October 30, 2024, after submitting revised proposed findings of fact and conclusions of law, the parties returned to deliver closing arguments.

Benefit seeks redress for trademark infringement, false designation of origin, and trade dress infringement under the Lanham Act, 15 U.S.C. § 1114 and § 1125(a). Benefit also brings trademark and trade dress infringement claims in contravention of California common law and for unfair competition under Cal. Bus. & Prof. Code § 17200.

### III. LEGAL STANDARD

The Lanham Act protects against another's use of "any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake . . . as to the origin . . . of his or her goods." *Jason Scott Collection, Inc. v. Trendily Furniture, Ltd. Liab. Co.*, 68 F.4th 1203, 1212–13 (9th Cir. 2023) (citing 15 U.S.C. § 1125(a)(1)(A)). To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party must prove: "(1) it has a protectible ownership interest in the mark; and (2) the defendant's use of the

1    mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Systems*

2    *Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (internal citation omitted). The burden of

3    proof rests squarely on the plaintiff. *See, e.g.*, *id.* "The elements of a claim for false designation of

4    origin under § 1125 are virtually the same as the elements of a claim for trademark infringement

5    under § 1114, although a § 1114 claim requires ownership of a registered trademark while a §

6    1125 claim does not." *GS Holistic, LLC v. Pudasaini*, No. 23-cv-00753, 2024 U.S. Dist. LEXIS

7    29733, at *14 (N.D. Cal. Feb. 21, 2024). Because infringement claims made under state common

8    law and California's Lanham Act analog are "substantially congruent" to federal ones, they may

9    be proven based on the same evidence and analysis. *See Cleary v. News Corp. Corp.*, 30 F.3d

10    1255, 1262-63 (9th Cir. 1994).

11        "Trade dress protection is broader in scope than trademark protection, both because it

12    protects aspects of packaging and product design that cannot be registered for trademark

13    protection and because evaluation of trade dress infringement claims requires the court to focus on

14    the plaintiff's entire selling image, rather than the narrower single facet of trademark." *Vision*

15    *Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989). To establish infringement of an

16    unregistered trade dress, Plaintiff must demonstrate: "(1) the trade dress is nonfunctional, (2) the

17    trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion

18    between the plaintiff's and defendant's products." *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d

19    747, 754 (9th Cir. 2018).

20        After an initial demonstration of protectability, the core of any trademark or trade dress

21    infringement claim is the likelihood of consumer confusion. *See Stone Creek, Inc. v. Omnia*

22    *Italian Design, Inc.*, 875 F.3d 426, 431. Courts ask, "whether a reasonably prudent marketplace

23    consumer is likely to be confused as to the origin of the good or service bearing one of the marks."

24    *Id.* (quotations and citation omitted). In *AMF, Inc. v. Sleekcraft Boats* ("*Sleekcraft*"), the Ninth

25    Circuit developed a flexible eight-factor test to guide the analysis of the likelihood of consumer

26    confusion. 599 F.2d 341 (9th Cir. 1979), *abrogated in part on other grounds by Mattel Inc. v.*

27    *Walking Mt. Prods.*, 353 F.3d 792, 810 (9th Cir. 2003). These factors are (1) strength of the mark;

28

United States District Court
Northern District of California

(2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Id.* at 348–49.

The *Sleekcraft* factors are flexible, neither exclusive or exhaustive, and not all factors are equal. "Applying the *Sleekcraft* test is not like counting beans," and "the relative importance of each individual factor will be case-specific." *One Indus., LLC v. Jim O'Neal Distrib.*, 578 F.3d 1154, 1162 (9th Cir. 2009) (cert. denied) (citing *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999)). Given the fluidity of the test, the plaintiff need not satisfy every factor, but must make a strong showing on at least some of the relevant factors to prevail. *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 631 (9th Cir. 2005).

Both parties concede the likelihood of expansion is not relevant and therefore should not factor into the analysis. *See Brookfield Commc'ns*, 174 F.3d at 1060 (treating likelihood of expansion as "relatively unimportant where two companies already compete to a significant extent").

## IV. TRADEMARK INFRINGEMENT

Benefit successfully establishes the protectability of its trademarks, but ultimately fails to show consumer confusion graduates from the hypothetical to the probable. Therefore, Benefit's trademark infringement claim fails. *See Cohn*, 281 F.3d at 842.

### A. Protectability

Benefit's properly registered word marks are clearly protectable. "Registration of a mark is prima facie evidence of the validity of the mark, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in connection with the goods specified in the registration." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (citing 15 U.S.C. § 1115(a)).

There also is no dispute Benefit's trademarks are valid and enforceable, have attained incontestable status, and Benefit enjoys priority in its marks. Benefit therefore has a protectible

ownership interest in the word marks "Roller Lash" and "Hook 'N Roll."  *See id.*; *see also*

*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999);

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 196 (1985).

### B. Infringement

Applying the *Sleekcraft* factors, Benefit has not shown a likelihood of confusion between

Benefit's and e.l.f.'s word marks. Most relevant to the analysis are the dissimilarity of the marks,

the lack of evidence of actual confusion, and the degree of care exercised by the average

purchaser.[2] The marketing and sales channels and e.l.f.'s intent also slightly favor e.l.f.'s position

that consumer confusion is unlikely. The strength of the mark and the proximity of the goods, both

of which favor Benefit, are not enough to overcome Benefit's deficiencies on the other factors.

### i.    Similarity of the Marks

The similarity of the marks is "considered [the] critical question in the likelihood-of-

confusion analysis." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000).

"[T]he greater the similarity between the two marks at issue, the greater the likelihood of

confusion." *Id.* at 1206. "Similarity of the marks is tested on three levels: sight, sound, and

meaning." *Sleekcraft*, 599 F.2d at 351. Courts may "assess individual features of the mark" even if

the decision rests on the overall similarity. *See Glow Indus. v. Lopez*, 252 F. Supp. 2d 962, 1122

(C.D. Cal. 2002). The Ninth Circuit asks how consumers encounter the products in the

marketplace, requiring courts to examine the marks' broader contexts. *See Cohn*, 281 F.3d at 842;

---

[2] Benefit insists three factors – the similarity of the marks, the relatedness or proximity of the products, and the marketing channels used – constitute "the most crucial body of the *Sleekcraft* analysis." Plaintiff's Revised Proposed Findings of Fact and Conclusions of Law ("Benefit FFCLs") at 110 (relying on *GoTo.com*, 202 F.3d at 1207). However, this "Internet trinity" is not the "controlling troika" in every case. *Network Automation*, 638 F.3d at 1148 ("Given the multifaceted nature of the Internet and the ever-expanding ways in which we all use the technology, however, it makes no sense to prioritize the same three factors for every type of potential online commercial activity."). In *Network Automation*, the Ninth Circuit reaffirmed the flexibility of the *Sleekcraft* factors, whose relative importance depends on the circumstances of the alleged infringement. *See id.* In this case, the similarity of the marks, the evidence of actual confusion, and the degree of care are most relevant, particularly given the attenuated relevance of e-commerce. And even if Benefit were correct, e.l.f. prevails on two of the three factors in the "trinity."

United States District Court
Northern District of California

*see also Arcona, Inc. v. Farmacy Beauty, LLC.*, 976 F.3d 1074, 1080 (9th Cir. 2020) (Courts "should not myopically focus on only the alleged counterfeit marks to the exclusion of the entire product or even common sense.").

Benefit contends Lash 'N Roll is a combination of Benefit's two word marks, Roller Lash and Hook 'N' Roll, infringing on each individually. At first blush, the similarity of these marks is persuasive. However, even when the marks are superficially identical, courts must examine their sight, sound, and meaning in the context of the marketplace. *Cohn*, 281 F.3d at 842.

Roller Lash and Lash 'N Roll do share the components "roll" and "lash." However, the marks diverge on meaning and overall commercial impression. Rather than a mere inversion of Roller Lash, as Benefit argues, Lash 'N Roll harmonizes with e.l.f.'s other music-inspired mascara lines, Lash It Loud and Lash Beats. Benefit's "roller," by contrast, references the vintage hair curler, which served as inspiration for Roller Lash's packaging and is a recurring motif in its marketing.

Benefit's argument for similarity is stronger when comparing Lash 'N Roll with Hook 'N' Roll. The word marks look and sound similar. However, their appearance in the market differs. While Lash 'N Roll appears prominently on the primary and secondary mascara packaging, Hook 'N' Roll is not included on the primary packaging of Roller Lash. Benefit includes Hook 'N' Roll on the side or back of its secondary packaging, in font smaller than the name Roller Lash or Benefit. To argue similarity of these word marks, Benefit avers this inclusion on the secondary packaging is highly relevant to consumers.[3] However, in contrast to Lash 'N Roll on e.l.f.'s secondary packaging, Hook 'N' Roll is undeniably overshadowed by Benefit's own brand name and the name Roller Lash.

The boxes themselves have notable differences. Roller Lash's secondary packaging features diamonds and hides the primary component entirely. E.l.f.'s packaging is pink and black,

---

[3] By contrast, Benefit argues for exclusion of the secondary packaging from the similarity analysis of its trade dress infringement claim. Although the trademark and trade dress infringement claims are analytically distinct, this incongruence is noteworthy. Benefit's later disregard of the secondary packaging undermines its argument here.

but uses a different shade of pink, is more pared down, and features a window displaying the primary component. These differences compound the gulf between e.l.f.'s and Benefit's word marks in the marketplace.

Finally, Benefit's similarity arguments are undercut by e.l.f.'s consistent use of its house mark. Prominent house marks can render even identical trademarks dissimiliar. *E.g.*, *Cohn*, 281 F.3d at 842; *Arcona*, 976 F.3d at 1080–81 (finding it would be "implausible that a consumer would be deceived because the products had their respective housemarks . . . prominently on the packaging"). On both the primary and secondary packaging of Lash 'N' Roll, e.l.f. is the "dominant commercial identity," *Cohn*, 281 F.3d at 842, as the e.l.f. brand name is in font almost twice as large as Lash 'N Roll. Despite superficial resemblance, e.l.f.'s mark is dissimilar from both of Benefit's trademarks based on the packaging differences and the use of the house mark.

### ii.    No Evidence of Actual Confusion

Because evidence of actual confusion can be difficult to obtain, its absence is "generally unnoteworthy" and is given little probative weight. *See Brookfield Commc'ns,* 174 F.3d at 1050. However, in cases such as *Cohn v. Petsmart, Inc.*, where the parties have used allegedly infringing marks in the same markets for years, "some evidence of actual confusion should have become available if [the would-be infringer's] coexisting use had created a genuine likelihood of confusion." 281 F.3d at 842–43. This case is essentially the same.

After two years of coexistence and more than 2.1 million units of Lash 'N Roll sold, Benefit has produced no evidence of actual confusion. Although Benefit avers this factor is neutral, this lack of evidence is a larger blemish than it admits. *See Brookfield Commc'ns*, 174 F.3d at 1050 ("We cannot think of more persuasive evidence that there is no likelihood of confusion between these two marks than the fact that they have been simultaneously used for five years without causing any consumers to be confused as to who makes what.").

E.l.f.'s expert Sarah Butler's survey found an insignificant 5% net rate of consumer confusion. This survey is the only empirical evidence provided as to consumer confusion. Benefit's expert, Dr. Jeffrey Stec, criticizes the methodology of Ms. Butler's survey and contends

her results should be ignored. However, Benefit clearly had the financial ability to hire its own expert and conduct its own survey to rebut directly the results reached by Ms. Butler. Because Benefit chose not to do so, its critiques of e.l.f.'s survey methodology ring hollow.

Granted, Benefit was not required to conduct its own survey. *See, e.g.*, *Jason Scott Collection*, 68 F.4th at 1217. However, given the overlap of marketing and sales averred here, Benefit had some responsibility to show consumer confusion beyond the mere hypothetical. Even discarding the results of Ms. Butler's survey, Benefit's inaction necessitates a negative finding. This factor weighs firmly against a likelihood of confusion.

### iii.    Degree of Consumer Care

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353. "When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely." *Id.* "Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." *Id.*

The parties dispute the degree of care with which beauty consumers approach their purchases. E.l.f. argues in the saturated beauty market, consumers differentiate between the countless products and brands available based on factors such as price, branding, ingredients, color, package design, online reviews, user-generated content, and what friends and family are purchasing. E.l.f. also points out cosmetic consumers are a natural analogy to skincare and fragrance purchasers, whom courts in this circuit treat as sophisticated. *See, e.g.*, *Boost Beauty, LLC v. Woo Signatures,* LLC, No. 2:18-cv-02960-CAS-Ex,, 2022 U.S. Dist. LEXIS 24515, at *30 (C.D. Cal. Feb. 7, 2022) (finding that consumers exercise a higher degree of care and brand consciousness with regard to more expensive "cosmetic products that consumers must apply to a sensitive portion of the body."); *Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F. Supp. 2d 1271, 1280 (C.D. Cal. 2008) ("[C]ourts have recognized that purchasers of fragrances and skin care products also exercise a higher degree of care and brand consciousness."); *Glow Indus.*, 252 F. Supp. 2d at 1001 ("Courts have previously recognized, however, that purchasers of fragrances and skin care products tend to exercise a high degree of care and brand consciousness."). E.l.f. also

OPINION AND ORDER
CASE No. 23-cv-00861-RS

points out mascara products themselves are used on sensitive areas, right next to the eyes.

Bn contrast, Benefit contends these products are relatively inexpensive, impulse purchases, "to which the average, unsophisticated consumer does not devote a great deal of care and consideration." *E. & J. Gallo Winery v. Gallo Nero*, 782 F. Supp. 457, 464–65 (N.D. Cal. 1991) (quotations omitted). Benefit argues an ordinary consumer would not pay much attention when purchasing a product that costs less than $50. *See Maxim Integrated Prods. v. Quintana*, 654 F. Supp. 2d 1024, 1035 (N.D. Cal. 2009) ("[A]n ordinary consumer is likely to exercise a low degree of care" where "products both cost close to $50.").

It is unnecessary to determine which party has the better description of the average beauty consumer. Instead, this factor turns on the parties' behavior. Both Benefit and e.l.f. spend huge amounts of time, money, and effort in tracking and fostering organic online reviews and mentions of its products. Benefit spent over $400,000 alone on one campaign with a TikTok beauty influencer, Alix Earle. Given that outsized resource allocation, it is clear Benefit itself believes these endorsements and reviews, paid and unpaid, return their value. Benefit's behavior in marketing its products and its brand reflects an understanding of the average beauty consumer as brand-aware, engaged in reviews and social media, and seeking out a particular curling mascara after research based on those sources. Benefit therefore behaves as though its consumer is sophisticated, does background research, and generally exercises a relatively high degree of care in purchasing mascara.

Benefit's arguments on price are also unconvincing. Benefit relies on cases where both the original and allegedly infringing products were similar in price. *See, e.g.*, *Maxim*, 564 F. Supp. 2d at 1035. Even if customers are making these mascara purchases on impulse, buying a product expected to be $6 at $29, or vice versa, would likely raise a consumer's eyebrow. The degree of customer care weighs against a likelihood of confusion, as parties treat these consumers as sophisticated, and the product price differential would increase purchaser attention.

### iv.    Strength of Mark

When assessing the strength of a mark, courts consider both conceptual and commercial strength. *See GoTo.com*, 202 F.3d at 1207. "The stronger the mark, the more likely it is that

encroachment on it will produce confusion." 1 McCarthy § 11:73 (quotations omitted). Benefit's word marks are conceptually and commercially strong.

Incontestability is relevant to determining the conceptual strength of a trademark. Courts in this circuit generally presume an incontestable mark is conceptually strong. *See, e.g.*, *San Diego Comic Convention v. Dan Farr Prods.*, 336 F. Supp. 3d 1172, 1186 (S.D. Cal. 2018) (quotations omitted); *Young v. 3.1 Phillip Lim, LLC*, No. SA CV 16-1556-DOC (KESx), 2016 U.S. Dist. LEXIS 158931, at *8 (C.D. Cal. Nov. 16, 2016) ("Absent a showing that the mark is generic, an incontestable mark is considered to have a high conceptual strength."); *YKK Corp. v. Jungwoo Zipper Co.*, 213 F. Supp. 2d 1195, 1201 (C.D. Cal. 2002) (finding "[t]he strength of the [asserted] mark is beyond question" based, in part, on the fact that the asserted mark had "achieved incontestable status"); *Adidas Am., Inc. v. Skechers USA, Inc.*, 149 F. Supp. 1222, 1243 (D. Or. 2016), *rev'd on other grounds*, 890 F.3d 747 (9th Cir. 2018) (finding plaintiff's trademark strong and noting "its conceptual distinctiveness is demonstrated by its incontestable federal registration"). While "the incontestable status of [a plaintiff's] mark does not require a finding that the mark is strong," *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n.3 (9th Cir. 2002), there is no reason here to doubt the conceptual strength of Benefit's word marks.

Commercial strength "may be demonstrated by commercial success, extensive advertising, length of exclusive use, and public recognition." *Harman Int'l Indus., Inc. v. Jem Access., Inc.*, 668 F. Supp. 3d 1025, 1039 (C.D. Cal. 2023) (quotations omitted). Benefit has provided ample evidence of Roller Lash's commercial success. Domestic sales of Roller Lash mascara have generated nearly $300 million in revenues, making Roller Lash the number one best-selling prestige curling mascara domestically.

Benefit's extensive marketing campaigns for Roller Lash also underscore the commercial strength of the marks. "The more extensively advertised and readily identifiable a mark and dress are in the relevant market, the stronger the mark and dress." *CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1070 (E.D. Cal. 2009). Benefit has run campaigns on social and traditional media, and even special in-person events promoting Roller Lash and its associated word marks.

United States District Court
Northern District of California

1    Over nine years, Benefit built up the commercial strength of Roller Lash and Hook 'N' Roll via

2    advertising, all of which highlighted the word marks.

3         The length of time Benefit has exclusively used its asserted trademarks further

4    demonstrates their commercial strength. Benefit launched Roller Lash in 2015 with marketing

5    assets and packaging that prominently displayed both asserted trademarks. Since then, Benefit has

6    exclusively and continuously used the marks. *See Maxim*, 654 F. Supp. at 1033 (finding plaintiff's

7    marks were commercially strong where plaintiff "spent more than two million dollars

8    advertising," there were millions of the products in circulation, and the marks "ha[d] been in use

9    for nearly ten years").

10        E.l.f.'s arguments against the strength of Benefit's trademarks fall short. E.l.f. contends the

11   Roller Lash mark is weak because other mascaras use the word "lash." However, under Ninth

12   Circuit law, the strength of a mark must be analyzed in its entirety. *See Official Airline Guides,*

13   *Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993) (explaining that, when analyzing strength of a

14   trademark, courts cannot "examin[e] its component parts" because "under the anti-dissection rule,

15   the validity and distinctiveness of a trademark is determined by viewing the trademark as a

16   whole"); *GoTo.com*, 202 F.3d at 1207 (explaining that while a mark may appear weak because its

17   individual components are common, "it is the mark in its entirety that must be considered not

18   simply the individual elements of that mark"). Benefit has adequately demonstrated the strength of

19   Roller Lash as an entire mark. The commercial strength of Roller Lash is even evidenced in part

20   by e.l.f.'s internal communications. E.l.f. employees acknowledged the name Lash 'N Roll would

21   draw an "instant connection" in the minds of consumers to Roller Lash. Tr. 482:3-14; PTX-017.

22   The overall strength of Benefit's trademarks weighs in favor of a likelihood of confusion.

23        **v.    Proximity of Goods**

24        Relatedness of the goods reflects the common-sense conclusion that the danger of

25   consumer confusion increases where the goods are related or complementary. *Gallo Cattle*, 967

26   F.2d at 1291. Roller Lash and Lash 'N Roll are in close proximity, as they are essentially the same

27   product for the same purpose, targeted to much the same consumer. When developing Lash 'N

28

United States District Court
Northern District of California

1   Roll, e.l.f. tested numerous potential formulas against that of Roller Lash to achieve the closest

2   comparison. The result was so close that e.l.f. employees even referred to its chosen formula as

3   "the Roller Lash one." E.l.f. admits it intended for Lash 'N Roll to mimic closely Roller Lash and

4   promotes the same "curling and lifting" benefits. The proximity of Benefit and e.l.f.'s goods

5   weigh in favor of a likelihood of confusion.

6       **vi.    Marketing and Sales Channels**

7           This factor requires courts to examine where the parties advertise and sell their products.

8   While overlap in marketing channels can increase the likelihood of consumer confusion, the

9   inverse is also true. *See Sleekcraft*, 599 F.2d at 353. This factor is ultimately neutral because

10  although there are large overlaps in where and how the parties advertise their products, the mostly

11  separate streams of prestige and mass cosmetic sales negate any increased likelihood of confusion.

12          Benefit and e.l.f. both advertise heavily on social media. Benefit and e.l.f. rely on paid and

13  earned media, and use the same targeted marketing methods, including influencers, posts, and

14  videos on the same social media platforms (including Instagram, YouTube and TikTok) to reach

15  the same target consumers. E.l.f. argues this advertising overlap means little in the digital age. *See*

16  *Network Automation*, 638 F.3d at 1151 ("Today, it would be the rare commercial retailer that did

17  not advertise online, and the shared use of a ubiquitous marketing channel does not shed much

18  light on the likelihood of consumer confusion."); *Playboy Enters. v. Netscape Commc'ns. Corp.*,

19  354 F.3d 1020, 1028 (9th Cir. 2001) ("Given the broad use of the Internet today, the same could

20  be said for countless companies. Thus, this factor merits little weight."). Although it is common

21  for companies to advertise on social media, the overlap between Benefit and e.l.f.'s advertisements

22  go beyond shared platforms. The parties use the same tactics, types of posts and videos, and

23  analytics tools to conduct their advertisements. Therefore, this aspect of the *Sleekcraft* factor

24  would support a likelihood of confusion.

25          By contrast, the overlap of sales channels is not as favorable to a likelihood of confusion.

26  Benefit emphasizes the probability of consumer confusion at the two retailers, Target and Ulta,

27  where both Roller Lash and Lash 'N Roll are sold. Given that the physical and online retail

28                                                  OPINION AND ORDER
                                                    CASE NO. 23-cv-00861-RS

United States District Court
Northern District of California

environments differ, even within the same retailer, each are analyzed separately.

The only brick-and-mortar stores where both products are sold are Ulta stores and select Target stores with an Ulta area therein. In its standalone stores, Ulta cordons off mass and prestige products from one another. Within the separate mass and prestige sections, Ulta tightly groups products from the same brand together, also known as "brand blocking." Both parties presented exhibits showing a "typical" Ulta store, and in every example, the mass and prestige sections were distinct, and products were blocked by brand, with distinct house marks on shelving and endcaps.

At select Target stores, Benefit's Roller Lash Mascara is found only in the dedicated Ulta section with other prestige beauty brands, while e.l.f.'s Lash 'N Roll Mascara is found with other mass beauty brands in the regular Target aisles. Target also utilizes brand blocking. It is clear from the physical architecture of these retailers that mass and prestige products are at least conceptually distinct. Therefore, the overlap in the brick-and-mortar stores appears minimal.

Benefit argues consumer confusion is likely when shopping online, where retailers do not brand block. While a brand's products are not necessarily grouped together on Ulta.com or Target.com, the Roller Lash and Lash 'N Roll product pages include "Benefit" or "e.l.f.," respectively, clearly in the title. Moreover, when viewing the general search results for "mascara," Target and Ulta's websites consistently list the brand before the name of the individual product. Therefore, the source of each product is equally clear online as it is in brick-and-mortar stores.

Benefit further points out in both the retail and online environments, consumers pay for Roller Lash and Lash 'N Roll using the same register or virtual shopping cart. It is true that a confused consumer would not necessarily realize their mistake as to the source of Lash 'N Roll once they arrived at the checkout counter. However, Benefit has not shown the required upstream confusion would occur in the first place, given brand-blocking and clear labeling of each brand online.

Furthermore, these retailers are not the sole channels by which Benefit and e.l.f. sell their products. As a prestige company, Benefit sells Roller Lash in department stores and other specialized beauty retailers such as Sephora and as a mass company, e.l.f. sells Lash 'N Roll in

OPINION AND ORDER
CASE NO. 23-cv-00861-RS

1    drug stores and big-box stores. Therefore, Benefit cannot point to a substantial overlap in sales

2    channels. While the results are mixed, this factor slightly favors e.l.f. in determining a likelihood

3    of confusion.

4         **vii.    E.l.f.'s Intent**

5         Because the Lanham Act is intended "to protect the goodwill created by using a uniform

6    mark," courts ask, "whether [the] defendant in adopting its mark intended to capitalize on

7    plaintiff's good will." *Blockbuster*, 141 F.3d at 1299; *Marketquest*, 862 F.3d at 934. Benefit avers

8    e.l.f.'s intent to copy would alone warrant a finding in its favor on this factor. However, an overall

9    intent to "cue" to Benefit's product is not quite intent to copy. Benefit argues e.l.f.'s intent to

10   create a "dupe," or a less expensive product that achieves the same result as Roller Lash, was an

11   intent to copy Roller Lash and its word marks. However, e.l.f. has convincingly demonstrated it

12   sought to create its own product in line with its broader branding. E.l.f. presented evidence it

13   chose the name Lash 'N Roll based on musical inspiration, independent from any intent to cue.

14   E.l.f. also designed Lash 'N Roll to be vegan and cruelty-free, features not shared by Roller Lash.

15   Finally, e.l.f.'s intent was always to contrast with Roller Lash in price, a differential foundational

16   to "dupes." Therefore, Benefit fails to show e.l.f.'s intent was to copy Roller Lash wholesale.

17        Moreover, an intent to copy is not inherently an intent to deceive. *See Fuddruckers, Inc. v.*

18   *Doc's B.R. Others, Inc.*, 826 F.2d 837, 844-45 (9th Cir. 1987); *Jason Scott Collection, Inc. v.*

19   *Trendily Furniture, LLC*, 68 F.4th 1203, 1219 ("[I]f there is proof of intentional copying with no

20   alternative explanation, an intent to benefit from the other's good will through confusion may be

21   inferred.") (citation omitted). Competitors could copy product features for a variety of reasons

22   beyond intent to deceive. A competitor may, for example, "choose to copy wholly functional

23   features that they perceive as lacking any secondary meaning because of those features' intrinsic

24   economic benefits." *Id.* E.l.f.'s use of "lash" is understandable in the mascara context. E.l.f.'s use

25   of "roll" can invoke curling, just as Benefit sought to do with its name. Therefore, e.l.f. has

26   provided an alternative explanation for the selection of its name, beyond merely its intent to cue to

27   Roller Lash.

When there is evidence of intent to copy, but not of intent to deceive, courts in this district view this factor as neutral or favoring the defendant. *See Glob. Tobacco, LLC v. R.K. Co.*, No. CV 15-05227-RGK (PJWx), 2015 U.S. Dist. LEXIS 190441, at *15 (C.D. Cal. Sep. 24, 2015) (finding that the intent factor was neutral when the "evidence indicates an intent to copy" but "no evidence before the Court regarding whether Defendant specifically intended to confuse consumers"); *Dayva Int'l, Inc. v. Award Prods. Corp*., No. CV-94-7331 KMW(SHx), 1996 U.S. Dist. LEXIS 22973, at *22-23 (C.D. Cal. Dec. 30, 1996) (finding that plaintiff failed to demonstrate a likelihood of confusion because while defendant "intended to copy numerous aspects of [plaintiff's product] and incorporate them into its own," the evidence did not indicate an intent to confuse or deceive consumers as to the source of its goods.).

Overall, while e.l.f. used Benefit's Roller Lash Mascara as an inspiration for the development of e.l.f.'s Lash 'N Roll Mascara, no evidence indicates e.l.f. intended to deceive consumers as to the source of its product. To the contrary, e.l.f. shows it intended to create a mass market curling mascara product under its brand name and brand qualities, at approximately a fifth of the price of Benefit's prestige product. Given the dearth of evidence showing an intent to deceive, this factor too favors e.l.f. in evaluating a likelihood of confusion.

Overall, Benefit has shown a mere possibility of consumer confusion where it needed more. Although satisfaction of all *Sleekcraft* factors is unnecessary, Benefit needed a strong showing with respect to at least some of the factors. *See Surfvivor Media*, 406 F.3d at 631. Despite its success on two factors, Benefit's showing elsewhere was lacking, particularly on the critical similarity analysis. While the *Sleekcraft* analysis goes beyond mere counting, the balance of these factors reveals only hypothetical consumer confusion in limited retail environments. Viewing the factors together, Benefit did not show a likelihood of confusion as to the source of e.l.f.'s Lash 'N Roll, nor a likelihood of confusion between Roller Lash and Lash 'N Roll. Therefore, Benefit's trademark infringement claim fails.

## V. TRADE DRESS INFRINGEMENT

To make out a claim for trade dress infringement under the Lanham act, a plaintiff must

United States District Court
Northern District of California

show that: "(1) its trade dress is protectable, and (2) a defendant's "use of the same or similar trade dress is likely to confuse consumers." *Fuddruckers*, 826 F.2d at 841. Courts ask, "whether there is a likelihood of confusion resulting from the total effect of the defendant's package on the eye and mind of an ordinary purchaser." *Id.* (internal quotation marks and citation omitted).

Although some of the relevant facts differ from the trademark claim when evaluating Benefit's trade dress, the end result is the same. Benefit succeeds in establishing the protectability of its trade dress but cannot show a likelihood of confusion. Therefore, e.l.f. has not infringed on Benefit's trade dress.

### A. Protectability

Benefit's first hurdle is the protectability of its trade dress. To establish a protectable trade dress, a plaintiff must (1) "adequately define the trade dress for which it claims protection"; (2) demonstrate that its trade dress is distinctive, and (3) demonstrate that its trade dress is nonfunctional. *Greenberg v. Johnston*, No. 14-cv-04605, 2014 U.S. Dist. LEXIS 194325, at *6-10 (C.D. Cal. Oct. 22, 2014); *see also Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998) (same). With respect to the second prong, a trade dress is "distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc*., 505 U.S. 763, 769 (1992). For the following reasons, Benefit's trade dress is protectable.

#### i. Adequate Definition

Benefit's trade dress is adequately defined as (1) a pink top, (2) a black base, and (3) pink lettering on the black portion of the product that matches the pink of the top. A court may not read in elements to a trade dress definition that the trade dress holder did not include in the trade dress definition. *See Sazerac Co. v. Fetzer Vineyards, Inc.*, 251 F. Supp. 3d 1288, 1301 (N.D. Cal. 2017) (Because plaintiff "identif[ied] the elements of its asserted trade dress . . . and chose not to list 'bourbon' as an element," the court could not "insert 'bourbon' into [plaintiff's] trade dress when it has elected to exclude it."). A trade dress holder's "asserted trade dress consists of the elements it listed—no more and no less." *Id.* E.l.f. insists Benefit incorrectly excluded "dominant and

distinctive" features of its trade dress. However, there is no requirement a trade dress definition include all features. Other details of Roller Lash's design, like the diamond pattern "tone on tone" texture on the top, the ribbed collar, and the tapered base, are not part of Roller Lash's trade dress, as defined by Benefit.

## ii.   Distinctiveness

When evaluating each element of trade dress protectability, courts in the Ninth Circuit focus "not on individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create." *Clicks Billiards v. Sixshooters Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001). Because Benefit's trade dress has acquired secondary meaning, it is unnecessary to decide whether Benefit's trade dress is product design or product packaging and whether the trade dress is inherently distinctive.

### a.   Genericness

Where the plaintiff asserts an unregistered trade dress, "non-genericness is a prima facie element of a plaintiff's claim for trade dress infringement." *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 68 F. Supp. 3d 1170, 1175 (C.D. Cal. 2014). In the context of trade dress, "the term 'genericness' covers three situations: (1) if the definition of a product design is overbroad or too generalized; (2) if a product design is the basic form of a type of product; or (3) if the product design is so common in the industry that it cannot be said to identify a particular source." *Walker & Zanger v. Paragon Industries, Inc.*, 549 F. Supp. 2d 1168, 1174 (9th Cir. 2007).

E.l.f. primarily argues the Roller Lash trade dress is so common in the mascara market as to be generic. E.l.f. relies on examples of third-party mascara products that also have a black base and pink top with matching pink writing on the base. E.l.f.'s alleged third-party uses largely do not use Benefit's asserted trade dress. Many of these simply use a black and pink color scheme, but not the same combination of black base and pink top. The third-party examples that approach the trade dress are discontinued and/or were sold only briefly and in unknown or *de minimis* quantities, including through limited channels. E.l.f.'s "third party use" evidence is insufficient to

United States District Court
Northern District of California

establish that asserted trade dress is common or widespread in the market, particularly in view of the thousands of mascaras sold without use of the trade dress, including all the mascaras currently for sale at Target and Ulta stores. Finally, e.l.f.'s own behavior acknowledges that Roller Lash's trade dress is not generic. In designing Lash 'N Roll's packaging, e.l.f. associated the colors and arrangement of the primary packaging as another "cue" to Roller Lash.

E.l.f. makes passing arguments about the overbreadth of Benefit's trade dress definition, but these averments improperly focus on individual elements of the asserted trade dress or on the use of pink and black generally. The proper focus, however, is on the trade dress as a whole. Here, Benefit seeks to protect a trade dress that is a specific combination and configuration of elements. It does not seek to protect use of any individual elements of its asserted trade dress, such as use of black or pink, or pink and black, on a mascara tube, or writing on a mascara base that matches the cap. Therefore, taken as a whole, Benefit's trade dress is not generic.

### b. Secondary Meaning

The Ninth Circuit defines secondary meaning as "the mental association by a substantial segment of consumers and potential consumers between the alleged mark and a single source of the product." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985). Consumers need not be able to identify the source of the product by name. *See Two Pesos*, 505 U.S. at 769-770. Secondary meaning can be established in a variety of ways, including "direct consumer testimony; survey evidence; exclusivity, manner, and length of use of mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Jason Scott Collection*, 68 F.4th at 1214 (citing *P & P Imps. LLC v. Johnson Enters., LLC*, 46 F.4th 953, 961 (9th Cir. 2022)).

Benefit has established secondary meaning by almost all of the above methods. Over the past nine years, Benefit has made considerable efforts to advertise and promote Roller Lash mascara in ways that prominently feature the Roller Lash Trade Dress. The social media-based earned market value ("EMV") associated with marketing Roller Lash is over $131 million and the number of impressions is 820 million. Press coverage for Roller Lash includes 622 articles, which

have achieved almost 200 billion unique visitors. Since 2015, Benefit has sold over $300 million worth of Roller Lash mascara, which is recognized as the bestselling curling mascara, including by e.l.f. which labeled it the "Holy Grail" of curling mascaras. Roller Lash has received extensive industry recognition winning multiple awards. Finally, Benefit has exclusively and consistently used the Roller Lash Trade Dress since the product's launch in 2015. Therefore, Benefit has adequately demonstrated secondary meaning. *See Clamp Mfg.*, 870 F.2d at 517; *First Brands v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987).

Evidence of deliberate copying also is "relevant to a determination of secondary meaning" and "in appropriate circumstances, deliberate copying may suffice to support an inference of secondary meaning." *Clicks Billiards*, 251 F.3d at 1264; *see also Vision Sports*, 888 F.2d at 615 ("[P]roof of copying strongly supports an inference of secondary meaning."). "That is because competitors generally copy to realize upon a secondary meaning that is in existence." *P & P Imps.*, 46 F.4th at 961 (citation and quotations omitted).[4] Acknowledging Roller Lash's secondary meaning, when choosing which leading mascara to duplicate, e.l.f. recognized Roller Lash as the "Holy Grail" of curling mascaras and chose it to use as "inspiration" due to its notoriety and popularity among consumers. Thus, when e.l.f. wanted Lash 'N Roll's primary package to communicate Roller Lash and the curling benefit to consumers, it chose Lash 'N Roll's pink and black color scheme, acknowledging that that is what consumers associate with Roller Lash.

E.l.f.'s assertion that lack of a secondary meaning survey "warrants an adverse inference" is unavailing. E.l.f.'s Revised Proposed Findings of Fact and Conclusions of Law ("e.l.f. FFCLs") at 52. There is no controlling Ninth Circuit authority for this position; instead, the Ninth Circuit repeatedly has held that "direct evidence of secondary meaning— such as . . . survey evidence

---

[4] To clarify, an intent to copy is sufficient to support a finding of secondary meaning, but this analysis of intent differs from the *Sleekcraft* intent factor. While some parties have previously argued "intentional copying supports a finding of secondary meaning only where the defendant intended to confuse consumers and pass off its product as the plaintiff's," which would align with the intent requirement under the *Sleekcraft* factor, the Ninth Circuit has declined to impose an intent to confuse requirement at the secondary meaning stage. *Jason Scott Collection*, 68 F.4th at 1215. Therefore, an intent to copy nonfunctional features supports an inference of secondary meaning, even when there was no intent to confuse consumers. *See id.*

United States District Court
Northern District of California

showing end-consumer recognition— . . . is not a requirement." *Jason Scott Collection*, 68 F.4th at 1217 (quotations omitted); *Clamp Mfg.*, 870 F.2d at 517 (affirming district court's finding of secondary meaning and noting the lack of "evidence concerning the views of actual purchasers" such as surveys "d[id] not overcome the findings of the district court on use and advertising"). Therefore, Benefit succeeds in establishing the secondary meaning of its trade dress.

### iii.   Functionality

Benefit's trade dress is not functional. The Ninth Circuit utilizes a two-part test in determining whether a trade dress is nonfunctional. *Millennium Labs. v. Ameritox, Ltd.*, 817 F.3d 1123, 1128–29 (9th Cir. 2016). At the first step, "courts inquire whether the alleged 'significant non-trademark function is essential to the use or purpose of the article [or] affects [its] cost or quality.'" *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1072 (9th Cir. 2006) (quoting *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32-33 (2001)). If the claimed trade dress is determined to be functional under the first step, then "the inquiry is over." *Id.* at 1072. If not, the second question is "whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage." *Id.*

The Ninth Circuit has identified several factors to consider regarding trade dress functionality: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Clicks Billiards*, 251 F.3d at 1260 (quotations omitted).

Several facts demonstrate the Roller Lash Trade Dress is non-functional. There is no utilitarian advantage gained from using a black base, pink cap and lettering on the base that matches the cap. The thousands of alternative packaging designs for mascara, including designs that both Benefit and e.l.f. have used for other mascara products and designs that e.l.f. considered but rejected for Lash 'N Roll, support this conclusion. None of Benefit's advertising touts any utilitarian advantages of the design. Finally, Benefit does not use the trade dress for manufacturing-related or cost advantages because there are no cost savings associated with using

United States District Court
Northern District of California

pink and black and lettering in the manner associated with the Roller Lash Trade Dress.

The protection of the Roller Lash Trade Dress would not impose any significant non-reputation-related competitive disadvantage because, among other things, the trade dress is limited to the specific configuration of specific elements and there are countless alternative designs available to competitors, as shown by the many third-party examples presented at trial.

E.l.f. argues that the black base of Roller Lash is functional because it indicates the color of the mascara. However, using black does not serve to identify the color of the mascara product in the tube. Benefit presented evidence showing mascara is usually black, yet many mascara tubes use non-black tubes, including e.l.f.'s Big Mood mascara. There is no evidence proving Benefit used black in this manner, or that any other mascara seller, including e.l.f., does either. E.l.f. even uses a black base for all three colors of Lash 'N Roll. In rebuttal, e.l.f. points to Benefit's use of brown on the base of a Roller Lash mascara tube when it briefly sold the mascara in brown. However, Benefit's packaging design team did not know Benefit would eventually release a brown color and did not consider that fact—or the black mascara color—when choosing the black base for Roller Lash.

Moreover, when the brown mascara was released, Benefit altered the black Roller Lash secondary packaging to add the words "black mascara" on the front panel and "black" on top; it did not use or rely on the black base color to indicate the black formula color. Thus, Benefit did not use the black base to indicate the mascara color. Instead, it added labeling to permit consumers to distinguish between brown and black mascara colors. Therefore, the evidence supports the conclusion that the black base color is not functional.

And even if Benefit did use black to communicate the color of the mascara inside the tube, the Roller Lash Trade Dress would still not be functional because it is a specific combination and orientation of black and pink. *See Clicks Billiards*, 251 F.3d at 1259 (explaining that the functionality analysis focuses "not on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create"). Therefore, Benefit has established its trade dress is nonfunctional, confirming its trade dress is protectable.

**B.  Infringement**

Benefit clears the first hurdle of protectability, but it cannot demonstrate a likelihood of confusion. Although some of the relevant facts differ from the trademark infringement analysis, the end result is the same. The dissimilarity of the dress, the lack of evidence of actual confusion, and the degree of care exercised by the average purchaser again weigh against any likelihood of consumer confusion. The marketing and sales channels and e.l.f.'s intent also slightly favor e.l.f.'s position. Overall, despite success on two factors, Benefit has not established the required probability of consumer confusion based on trade dress.

       *i.*   *Similarity*

The dissimilarity of the trade dresses cuts against the likelihood of consumer confusion. When assessing similarity of trade dress, "courts should consider the two trade dresses in their entirety and as they appear in the marketplace . . . and weigh similarities more heavily than differences." *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1178 (C.D. Cal. 2010) (citing *GoTo.com*, 202 F.3d at 1206).

While Benefit is entitled to define its trade dress as it sees fit, at this stage the contested trade dress is viewed in its entirety. Benefit insists the visual stimuli in the retail environment, coupled with limited views in the online environment, make for a similar appearance of both products in the marketplace. However, the visual dissimilarities between Benefit's asserted trade dress and Lash 'N Roll's packaging outweigh any similarities, especially considering the secondary packaging and the prominence of the "e.l.f." house mark.

Despite Benefit's insistence, courts cannot focus solely on the primary packaging simply because it is the contested trade dress. *See Arcona*, 976 F.3d at 1080. Even though the two primary packaging designs are similar, they are each sold exclusively in secondary packaging that is markedly different. Benefit points out Lash 'N Roll's secondary package has a clear window to display the primary component. Benefit also presents examples of its typical retail display, which often includes one Roller Lash primary component shown out of the box to highlight the brush. The combination of those two facts, Benefit argues, negates any distinguishing impact the

United States District Court
Northern District of California

secondary packaging has in the marketplace. However, this argument is unconvincing given the important role the secondary packaging plays in consumers' interaction with the product. In-person shoppers must pick up the secondary packaging to purchase the product. And online, the secondary packaging is included in some of the provided photos of each product. Even if the secondary packaging were irrelevant, it is necessary to consider another potential distinguishing characteristic – the house mark.

The house mark, like in the trademark analysis, serves to distinguish the trade dresses in the marketplace. The house mark "e.l.f." is included in the largest font size next to the words Lash 'N Roll on both the primary component and secondary packaging of Lash 'N Roll. While the text size of Benefit's house mark on its packaging is small in comparison to the Roller Lash mark, the combination of the house mark and the distinct secondary packaging makes the trade dress dissimilar in the marketplace. *See Amarte USA Holdings, Inc. v. Kendo Holdings Inc.*, No. 22-cv-08958-CRB, 2024 U.S. Dist. LEXIS 159201, at \*21-22 (N.D. Cal. Sept. 4, 2024) (finding marks are not similar when the products have prominent use of house marks and different outer packaging). When sold online, each webpage presented at trial features Benefit or e.l.f. clearly in the title of the product. In the retail space, these differences are even more apparent because the products are displayed using brand blocking and are offered and sold in their distinguishable secondary packaging.

Given the totality of the circumstances in the marketplace, Benefit's similarity arguments fall short. Therefore, this factor weighs against likelihood of confusion.

### ii.    *Lack of Actual Evidence and Degree of Consumer Care*

These factors both weigh against a likelihood of confusion, for the reasons discussed in Section IV.B.ii and iii. Benefit has failed to show any actual evidence of consumer confusion, despite several years of simultaneous sales of Roller Lash and Lash 'N Roll. Because mascara is a product applied to a sensitive area and the parties' target consumer is well-informed, the degree of consumer care also weighs against a likelihood of confusion.

### iii.    *Strength*

As in the trademark infringement analysis, the strength of Roller Lash's trade dress weighs slightly in favor of a likelihood of confusion. Benefit shows some evidence of conceptual strength based on the protectability of its trade dress. Courts in the Ninth Circuit often look at whether the trade dress has attained secondary meaning to determine the strength of the claimed trade dress. *See, e.g., Network Automation*, 638 F.3d at 1147 (considering evidence regarding secondary meaning in determining strength of the mark); *Tee Turtle, LLC v. Anhui Leadershow Household Indus. Co.*, No. CV 21-4703-CBM-(Ex), 2021 U.S. Dist. LEXIS 114490, at *8 (C.D. Cal. Jun. 17, 2021) ("Because Plaintiff has demonstrated a likelihood that its trade dress has acquired secondary meaning, its trade dress is likely strong."); *Glob. Tobacco*, 2015 U.S. Dist. LEXIS 190441, at *14 ("Plaintiff's showing that the Clipper Trade Dress has acquired secondary meaning, and thus commercial strength, weighs in favor of a likelihood of confusion.").

Benefit's trade dress is a specific combination and configuration of elements that, out of the thousands of different mascara tube designs sold, only a handful of third parties have approached. In instances where third parties have approached Benefit's trade dress, there is no evidence of their extent of use, the use has been discontinued, or the use had *de minimis* sales. *See See Nat'l Lead Co. v. Dannenfelser*, 223 F.2d 195, 204 (9th Cir. 1955) (disregarding evidence of third-party use because it was de minimis in the market for paint); *Rebelution, LLC v. Perez*, 732 F. Supp. 2d 883, 891-93 (N.D. Cal. 2010) ("[W]ithout evidence of the scope of use by third parties, the degree to which plaintiff's mark was weakened by these users cannot be determined.").

Benefit's trade dress is also commercially strong. Commercial strength "may be demonstrated by commercial success, extensive advertising, length of exclusive use, and public recognition." *Harman Int'l Indus.*, 668 F. Supp. 3d at 1039 (quotations omitted). As discussed above, Roller Lash has achieved demonstrated success in the mascara market after Benefit's extensive advertising efforts over nine years. Importantly, this advertising highlighted Benefit's trade dress, as defined. Therefore, the strength of Roller Lash's trade dress supports a likelihood of confusion.

      *iv.*    *Proximity*

United States District Court
Northern District of California

As discussed above in Section IV.B.iv, Roller Lash and Lash 'N Roll are products in close proximity. This factor would support a likelihood of confusion.

### v.    Intent

E.l.f.'s intent to cue to Roller Lash through Lash 'N Roll's trade dress again slightly favors e.l.f. Benefit relies on e.l.f.'s intent to copy or cue to Roller Lash using Lash 'N Roll's trade dress. Much like in the trademark context, e.l.f. provided ample explanation for its selection of Lash 'N Roll's primary trade dress, beyond a mere intent to copy Roller Lash wholesale. Lash 'N Roll's initial design was an all-pink primary component mascara tube. E.l.f. decided on a shade of pink, which differs from the Roller Lash shade, based on its own product line. Due to timing constraints and an issue with matching the pink top with the pink base of the primary component mascara tube, e.l.f. had to make a design change to the primary component, eventually changing the base to black. E.l.f.'s design team chose black because it provided a safe resolution to the color mismatch issue, is one of e.l.f.'s main brand colors, and is generally common in the beauty industry. Although e.l.f.'s internal communications show e.l.f. intended for, or was at least aware of, the cuing effect of the black and pink trade dress, e.l.f. has rebutted Benefit's claim of intent to deceive. Therefore, this factor tips in e.l.f.'s favor in likelihood of confusion analysis.

### vi.    Marketing and Sales Channels

Finally, for the reasons discussed in Section IV.B.vi, the marketing and sales channels slightly favor e.l.f.'s position. Given the same balance of factors, Benefit cannot establish a likelihood of confusion based on trade dress. Because confusion is the core of Benefit's burden of proof, its trade dress infringement claim fails.

## VI. CONCLUSION

Ultimately, Benefit has not shown that Lash 'N Roll, while it is a "dupe" of Roller Lash, actually dupes any consumers. Under current trademark and trade dress law, Benefit was required to show consumer confusion was likely, rather than merely hypothetical. While some dupes could potentially cross the line and engender consumer confusion, Benefit has not shown such a risk is present here. Therefore, e.l.f. is not liable for trademark nor trade dress infringement. Accordingly,

OPINION AND ORDER
CASE NO. 23-cv-00861-RS

1  Benefit is not entitled to disgorgement of e.l.f.'s profits, nor is Benefit entitled to injunctive relief.

2

3  **IT IS SO ORDERED**.

4

5  Dated: December 17, 2024

6  _____

7  RICHARD SEEBORG
   Chief United States District Judge

OPINION AND ORDER
CASE NO. 23-cv-00861-RS

United States District Court
Northern District of California